KEVIN G. CLARKSON
ATTORNEY GENERAL

Margaret Paton-Walsh
(AK Bar No. 0411074)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov

Attorney for the State of Alaska

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

DISABILITY LAW CENTER OF           )
ALASKA, NATIVE PEOPLES ACTION      )
COMMUNITY FUND, ALASKA             )
PUBLIC INTEREST RESEARCH           )
GROUP, ALEIJA STOVER, AND          )
CAMILLE ROSE NELSON,               )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )
                                   )
KEVIN MEYER, LIEUTENANT            )    Case No. 3:20-cv-00173-JMK
GOVERNOR OF ALASKA, and the        )
STATE OF ALASKA, DIVISION OF       )    **OPPOSITION TO MOTION FOR**
ELECTIONS,                         )    **PRELIMINARY INJUNCTION**
                                   )
          Defendants.              )
_____)

## I.     INTRODUCTION

       In March of this year, the State of Alaska faced the onset of a devastating

pandemic of COVID-19, a disease caused by a novel coronavirus. As the pandemic

spread across the nation, Alaska—like its sister states— considered how it could safely conduct the 2020 primary and general elections while maintaining the integrity of the process. Lieutenant Governor Kevin Meyer concluded that a last-minute shift to an all-mail election—something the State had never done before—entailed too many risks. Instead, he opted to maintain the traditional election day in-person voting process, while simultaneously encouraging Alaska voters to utilize the myriad absentee and early voting options to reduce the number of voters at polling places on election day. In particular, the Division of Elections ("the Division") encouraged the use of its new online absentee ballot application process and the Lieutenant Governor's office mailed a paper absentee-by-mail application form to those voters who the Division could readily determine were particularly vulnerable to COVID-19 and who might be less comfortable with the online form—i.e. voters aged 65 and older.

The plaintiffs—three organizations and two voters under the age of 65 (collectively, "DLC")—object to this reasonable, legitimate act of outreach to elderly voters because it did not reach all voters who might wish to avoid the polls this year. They claim that the mailing of paper applications violates both the state and federal constitutions and the Americans with Disabilities Act. [*See* Dkt. 1-1] After the State removed the case to this Court, the plaintiffs added an additional, unrelated claim that the State's statutory deadline to submit an absentee-by-mail ballot application violates the Voting Rights Act, 52 U.S.C. § 10502(d). [Dkt. 8-1 at 27-28] The plaintiffs seek a preliminary injunction ordering the State "to immediately mail absentee ballot

*DLC, et al. v. Meyer, et al.*                                      Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                      Page 2 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 2 of 29

applications for all upcoming 2020 elections to all eligible Alaska voters who have not yet received one" and to comply with the deadline in 52 U.S.C. § 10502(d).

This Court should deny DLC's motion because they have not met their burden to justify the "extraordinary and drastic" remedy of a preliminary injunction. A mandatory preliminary injunction should not be granted "unless the facts and law clearly favor the plaintiff,"[1] and here, neither do. The State's outreach to elderly voters does not abridge other voters' right to vote: all Alaskan voters continue to have many voting options—including absentee-by-mail voting—even if they did not receive the paper application mailing. And this Court should not second-guess the Division's assessment about how to most effectively administer the 2020 elections in the context of a pandemic.

## II.    FACTS

### A.    Voting in Alaska.

The State of Alaska has a long history of expanding voting access and facilitating voters' exercise of their right to vote. In 2016, the State adopted by initiative a measure that automatically registers Alaskans to vote when they apply for a permanent fund dividend. [Fenumiai Decl. at ¶ 3] More than 78,000 Alaskans have been registered to vote by applying for a permanent fund dividend.

Alaska provides a wide variety of ways for registered voters to cast their votes in state elections, either before or on election day and either in person or by absentee ballot.

---

[1]    *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986).

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                    Page 3 of 29
Case 3:20-cv-00173-JMK    Document 22    Filed 08/03/20    Page 3 of 29

For example, unlike some states,[2] Alaska allows any qualified voter to vote an absentee ballot "for any reason."[3] Under the State's no-excuse absentee ballot system, any registered voter can vote absentee by applying for an absentee ballot starting January 1 of the year in which the election will be held. [Fenumiai Decl. at ¶ 4]

Voters can obtain absentee ballot application forms in many different ways: by picking one up from a regional office, by calling the Division and requesting that a form be mailed, or by finding one at the local library, tribal office, municipal office, or other location to which the Division distributes election outreach materials, including absentee ballot application forms. [Fenumiai Decl. at ¶ 5] In addition, political parties, candidates, and other interest groups routinely distribute absentee ballot application forms to voters. [Fenumiai Decl. at ¶ 6]

This year, for the first time, voters can also apply for their absentee ballots online with a valid state driver's license or state identification card. [Fenumiai Decl. at ¶ 8] Approximately 95 percent of registered voters have one of these types of identification. [Fenumiai Decl. at ¶ 8] There is a link to the online form on the Division of Election's

---

[2]     Sixteen states require voters to provide an "excuse" for why they cannot come to the polls on election day: Alabama, Ala. Code § 17-11-3; Arkansas, Ark. Code Ann. § 7-5-402; Connecticut, C.G.S.A. § 9-135; Delaware, 15 Del. Code § 5502; Indiana, Ind. Code §3-11-10-24; Kentucky, Ken. Rev. Stat. § 117.085(1)(a), §117.077; Louisiana, LSA-R.S. 18:1303; Massachusetts, M.G.L.A. 54 § 86; Mississippi, Miss. Code Ann. § 23-15-715; Missouri, V.A.M.S. 115.277; New Hampshire, N.H. Rev. Stat. § 657:1; New York, § 8-400; South Carolina, § 7-15-320; Tennessee, T.C.A. § 2-6-201; Texas, V.T.C.A., Election Code § 82.001 et seq.; and West Virginia, W.Va. Code, §3-3-1.

[3]     AS 15.20.010.

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                              Page 4 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 4 of 29

home page[4] as well as on the State of Alaska's homepage.[5] Use of this online form eliminates mailing time and the Division can process online applications faster. [Fenumiai Decl. at ¶ 9]

For each mailed absentee ballot application form, a division employee has to open the envelope, date stamp the application, check that it is complete, and attempt to decipher sometimes illegible handwriting, before batching it to be processed for sending out ballots. [Fenumiai Decl. at ¶ 9] If an application is incomplete or illegible, a division employee contacts the voter to assist in completing the application. [Fenumiai Decl. at ¶ 9] All of this processing time is eliminated if the voter applies online.

Voters applying for absentee ballots can request that their ballots be either mailed to them or delivered by electronic transmission. If the absentee ballot is to be mailed to the voter, the application must be submitted at least ten days before the election. But a request for delivery by electronic transmission can be submitted up until 5:00 p.m. the day before the election.[6] [Fenumiai Decl. at ¶ 10] By-mail absentee ballots must be mailed back to the Division on or before election day, but the Division strongly encourages mailing before election day to ensure ballots arrive within the required 10-day period following the election.[7] [Fenumiai Decl. at ¶ 4]

The Division also allows voters who are overseas or who have a disability that

---

[4]     https://www.elections.alaska.gov/.

[5]     http://www.alaska.gov/.

[6]     AS 15.20.081(b).

[7]     AS 15.20.081(e).

*DLC, et al. v. Meyer, et al.*                  Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                       Page 5 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 5 of 29

makes it difficult for them to vote in person to establish what is called "permanent absentee voting" status. [Fenumiai Decl. at ¶ 14] These voters are automatically sent an absentee ballot every election year, rather than having to apply each time. [Fenumiai Decl. at ¶ 14] There are more than 9,500 such voters in 2020. [Fenumiai Decl. at ¶ 14] Finally, the Division also provides additional assistance to voters with a disability through the "special needs voting" process.[8] Special needs voters can have a representative request a special needs ballot starting 15 days before the election through election day. [Fenumiai Decl. at ¶ 15] The representative then delivers the ballot to the voter, witnesses the voter's signature, and returns the ballot to the Division allowing the voter to cast their vote at home. [Fenumiai Decl. at ¶ 15]

Voters also have several options for voting in person. For example, a voter can vote one-on-one with an absentee voting official or election supervisor at one of 140 in-person absentee voting locations across the State starting 15 days before the election and up to election day. [Fenumiai Decl. at ¶ 11] Or a voter can vote early at one of eight early voting sites starting 15 days before election day.[9] [Fenumiai Decl. at ¶ 12] Or, of course, a voter can vote in person on election day at one of over 440 polling places the Division plans to have open from 7 a.m. to 8 p.m. Unlike other states that have drastically reduced the number of polling places available this year, the Division is striving to maintain a normal number of polling places to ensure every voter can vote in the manner

---

[8]     AS 15.20.072.

[9]     Absentee in person voting is authorized by AS 15.20.061; early voting is authorized by AS 15.20.064.

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                              Page 6 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 6 of 29

they are comfortable with. [Fenumiai Decl. at ¶ 13]

**B.     Impact of the COVID-19 pandemic.**

As the Court is aware, the COVID-19 pandemic has upended life across the globe, adding unprecedented complexity to otherwise routine government functions—including running elections. Confronted with ever-evolving public health information and guidance and ongoing adjustments to government mandates, the Division is working tirelessly to make this election run smoothly, fulfill its statutory mandates and maintain the integrity of Alaska's elections.

In April, the Alaska Legislature enacted SB 241 to address many aspects of the State's response to the pandemic. Among other things, it authorized—but did not require—the Division of Elections to conduct the 2020 elections entirely by mail.[10] [Applebee Decl. at ¶ 3] Lieutenant Governor Meyer considered the current state of the pandemic in Alaska, contemporaneous scientific and medical understanding of the character of the disease—particularly demographic groups that were thought to be especially vulnerable—and the administrative complexity of conducting statewide elections by mail for the first time in Alaska's history with only a few months to prepare. Faced with those concerns, he ultimately determined that a hasty conversion to an all-by-mail election was inadvisable. [Applebee Decl. at ¶¶ 4-5]

The Division is now in the position of conducting and overseeing an election in a worldwide pandemic. Staff are working hard to assure the primary and general elections

_____

[10]     2020 SLA ch. 10, § 9.

*DLC, et al. v. Meyer, et al.*                                                          Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                                           Page 7 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 7 of 29

run smoothly and meet the various critical deadlines set forth in state law. To this end, in addition to facilitating the many diverse voting options and procedures outlined above, the Division has arranged for social distancing, masks, gloves, and sanitizing in over 440 polling places around the state; recruited election workers to staff those polling places in a year when far fewer people are willing to serve in this role; created new distanced training to avoid unnecessary exposure for smaller communities and its employees; and already processed an unprecedented number of absentee ballot applications. [Fenumiai Decl. at ¶ 2] At the same time, the Division is adjusting its internal workplace protocols to protect the safety of Division employees and poll workers.

In addition, and in order to help mitigate the risk to Alaskans, the Lieutenant Governor explored ways to increase absentee voting while not overwhelming the administrative capacity of the Division of Elections. [Applebee Decl. at ¶ 5] To that end, in May 2020 he decided to supplement the Division's new online absentee ballot application system with an additional absentee voting outreach effort, mailing voters aged 65 and older a paper absentee ballot application form. This group was selected because public health officials at the time indicated that people 65 and older—a group readily identifiable by the Division based on date of birth information for voters already on file— as a high-risk group who must be particularly careful to avoid exposure to COVID-19. [Applebee Decl. at ¶ 7; Zink Decl. at ¶ 3] Although other high-risk groups exist—such as people with certain underlying medical conditions—the Division cannot identify such voters with the limited information in division records. [Applebee Decl. at ¶ 8]

Nearly one month ago, on July 9 and 10, the Division mailed absentee ballot

*DLC, et al. v. Meyer, et al.*        Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.        Page 8 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 8 of 29

applications to 97,281 voters aged 65 and older.

## C.     This lawsuit.

On July 17, DLC filed suit in state superior court alleging violation of the state and federal constitutions and the Americans with Disabilities Act. The State timely removed to this court. On July 22, DLC filed an amended complaint and a motion for preliminary injunction.

DLC challenges the State's outreach efforts to elderly voters, arguing that the mailing to voters aged 65 and older:

- violates the Twenty-Sixth Amendment to the United States Constitution [Count I],

- violates the right to vote and thus the Due Process Clauses of the federal and state constitutions, [Counts II and III],

- violates Article I, § 3 of the Alaska Constitution, which protects Alaskans' civil and political rights [Count IV],

- violates the "right to vote on geographic basis," allegedly contrary to an unidentified section of the Alaska Constitution [Count V], and

- violates Title II of the Americans with Disabilities Act by failing to provide reasonable accommodations. [Count VI]

DLC's amended complaint also adds a new count claiming that the statutory deadline to return absentee-by-mail ballot applications violates the Voting Rights Act. [Dkt. 8-1 at 27-28, Count VII]

DLC seeks a preliminary injunction ordering the State to "immediately mail

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                    Page 9 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 9 of 29

absentee ballot applications to all eligible Alaskan voters who not yet received one;" [Dkt. 13 at 2-3] and "to comply with 52 U.S.C. § 10502(d) by accepting and processing all applications for absentee ballots received up to seven days before the November general election." [Dkt. 12-1 at 2] But DLC cannot meet the standard for a preliminary injunction because the State's outreach efforts to elderly Alaskans do not violate either the state or federal constitutions or the Americans with Disabilities Act; and the Alaska statute requiring that applications "requesting delivery of an absentee ballot to the applicant by mail must be received by the division of elections not less than 10 days before the election…"[11] does not violate the 52 U.S.C. § 10502(d).

## III.    LEGAL STANDARDS

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."[12] To meet this burden, DLC must show that the following four factors are met: (1) DLC is likely to succeed on the merits, (2) DLC is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in DLC's favor, and (4) an injunction is in the public interest.[13]

If DLC cannot show it is likely to succeed on the merits, the Court should then

---

[11]    AS 15.20.081(b).

[12]    *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quotation omitted). *See also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

[13]    *Winter*, 555 U.S. at 20.

*DLC, et al. v. Meyer, et al.*                                                  Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                                          Page 10 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 10 of 29

look to see if DLC can show "serious questions going to the merits."[14] If so, "a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,'" the plaintiff will suffer irreparable harm and the injunction is in the public interest.[15]

DLC also faces a heightened burden in this case because it is seeking a mandatory preliminary injunction, meaning an order requiring the State to act as opposed to refrain from acting. A mandatory preliminary injunction should not be granted "unless the facts and law clearly favor the plaintiff."[16] This is especially true here given that the U.S. Supreme Court has expressly cautioned against making changes midway through an election cycle.[17] Here, of course, the general election is barely three months away.

## IV.     ARGUMENT

Given the extraordinary remedy DLC demands, it must show both that it is likely to succeed on the merits of its claims, *and* that it will be irreparably harmed if no injunction issues, that the equities tip strongly in its favor, and that an injunction will serve the public interest.[18] But DLC has not established any of these elements, so the Court should deny the requested injunction.

---

[14]     *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

[15]     *Id*. (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

[16]     *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986).

[17]     *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

[18]     *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013) (citing *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                    Page 11 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 11 of 29

DLC cannot show it is likely to succeed on the merits because the State's outreach efforts do not burden, abridge or deny any Alaska voter's right to vote. The State's decision to engage in outreach to elderly voters in the context of a dangerous pandemic easily passes rational basis review. DLC's statutory claims also plainly lack merit because the Americans with Disabilities Act simply does not apply here and the Division satisfies the Voting Rights Act provision by accepting electronic transmission absentee ballot applications up to the day before election day.

### A. Because the State has not infringed on any voters' fundamental right to vote, the constitutional claims are meritless.

DLC's various constitutional claims all rest on the false premise that mailing a paper absentee ballot application to some voters necessarily abridges or denies other voters' right to vote. This is not so. Any voter in Alaska is able to obtain an absentee ballot application. And Alaskan voters continue to have many voting options—including absentee-by-mail voting—even if they did not receive an unsolicited paper absentee ballot application in the mail from the Division. Because the State has not abridged any voter's right to vote or employed any suspect classification, strict scrutiny does not apply. The State's action here—an outreach effort aimed at an identifiable at-risk group—was a reasonable measure that satisfies all applicable legal tests.

### 1. Strict scrutiny does not apply under any of DLC's constitutional theories.

Although voting is a fundamental right, DLC cannot obtain strict scrutiny of the State's mailing on the theory that it burdens that fundamental right. Federal courts evaluate alleged burdens on the right to vote under the "*Anderson-Burdick*" framework,

*DLC, et al. v. Meyer, et al.*                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                    Page 12 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 12 of 29

named after the U.S. Supreme Court cases *Anderson v. Calabrezze*[19] and *Burdick v. Takushi*.[20] The Alaska Supreme Court has endorsed this framework too.[21] Under *Anderson-Burdick*, a court weighs "the character and magnitude of the asserted injury" against "the precise interests put forward by the State as justifications for the burden."[22] This is a "sliding scale" test, meaning that "the more severe the burden imposed, the more exacting [the] scrutiny; the less severe, the more relaxed [the] scrutiny."[23] "Under this framework, strict scrutiny applies only where the burden on the fundamental right to vote is severe."[24] A "lesser burden" on the right to vote may be justified by the state's "important regulatory interests."[25]

Here, DLC can show no burden on the right to vote whatsoever, let alone a "severe" burden. They assert that the State's mailing "effectively handicap[s] exercise of the franchise" and "impos[es] obstacles on voters," [Dkt. 13 at 19-20], but it does no such thing. Indeed, the State's mailing has no effect on voters who did not receive it. Those

---

[19]    460 U.S. 780 (1983).

[20]    504 U.S. 428 (1992).

[21]    *See Sonneman v. State*, 969 P.2d 632, 636-38 (Alaska 1998).

[22]    *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

[23]    *De La Fuente v. Padilla*, 930 F.3d 1101, 1105 (9th Cir. 2019) (citations omitted).

[24]    *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018); *see also Gonzalez v. Arizona*, 485 F.3d 1041, 1049 (9th Cir. 2007) ("[L]aws that burden the right to vote only incidentally need not be strictly scrutinized"); *Luft v. Evers*, 963 F.3d 665, 671–72 (7th Cir. 2020) ("Courts weigh these burdens against the state's interests by looking at the whole electoral system. . . . Only when voting rights have been severely restricted must states have compelling interests and narrowly tailored rules.").

[25]    *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015) (citing *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010)).

*DLC, et al. v. Meyer, et al.*                                      Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                      Page 13 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 13 of 29

voters retain the same diverse and ample voting options—including absentee-by-mail voting—as they had before the mailing.[26] They can still obtain an absentee ballot by either applying online, printing out an application from the Division's website, picking up a paper application from a state office, municipal office, library, or tribal council, or by calling the Division to request a paper application. [Fenumiai Decl. at ¶ 5] Even if these assorted options (one of which is a simple phone call) are considered "obstacles," they pre-date the State's mailing and are not severe burdens.[27] DLC provides no evidence—and indeed do not even allege—that a single voter will somehow be prevented from voting as a result of the State's mailing.[28]

The Ninth Circuit's decision in *Short v. Brown* is therefore directly analogous and controlling.[29] In that case, the plaintiffs challenged California's phased enactment of an all-mail voting system, under which residents of certain counties received ballots by mail automatically, while voters in other counties had to take steps to register if they wished to

---

[26]    *Cf. Luft*, 963 F.3d at 672 (explaining that "Wisconsin has lots of rules that make voting easier" and that "[t]hese facts matter when assessing challenges to a handful of rules that make voting harder").

[27]    *See Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008) ("For most voters who need [photo identification], the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.").

[28]    *Cf. Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (observing that the "[p]laintiffs introduced extensive evidence that a significant number of Ohio voters will in fact be precluded from voting" by the challenged state action).

[29]    893 F.3d 671 (9th Cir. 2018).

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                    Page 14 of 29

receive ballots by mail.[30] The Ninth Circuit applied the *Anderson-Burdick* framework,
explaining that "the Constitution permits states to impose some burdens on voters
through election regulations, and it requires strict scrutiny of those regulations only
where the burden imposed is severe."[31] The court recognized that California's phased
system "does not burden anyone's right to vote. Instead, it makes it easier for some voters
to cast their ballots by mail, something that California voters already can do."[32] For
voters who did not automatically receive ballots by mail, "their access to the ballot is
exactly the same as it was prior to" the change in the law.[33]

The court dismissed the plaintiffs' concern about the steps such voters would need
to take to get a by-mail ballot—steps that are similar to those required in Alaska[34]—
concluding that "[t]o the extent that having to register to receive a mailed ballot could be
viewed as a burden, it is an extremely small one, and certainly not one that demands
serious constitutional scrutiny."[35] There—just as here—the plaintiffs had "not even
alleged—let alone introduced evidence to demonstrate—that the [state's action] will
prevent anyone from voting."[36] Strict scrutiny therefore did not apply.[37] And the Ninth

---

[30]     *Id.* at 674-75.

[31]     *Id.* at 677.

[32]     *Id.*

[33]     *Id.*

[34]     *Id.* at 675 n.6.

[35]     *Id.* at 677.

[36]     *Id.*

[37]     *Id.*

*DLC, et al. v. Meyer, et al.*
Opp. to Mot. for Prelim. Inj.

Case No. 3:20-cv-00173-JMK
Page 15 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 15 of 29

Circuit ultimately affirmed the district court's denial of a preliminary injunction, concluding that the case did not even raise "serious questions" on the merits.[38]

*Short v. Brown* is also instructive in explaining why DLC cannot obtain strict scrutiny of the State's mailing by pointing to differential treatment on the basis of age in the absence of any actual burden on the right to vote. In *Short*, the plaintiffs argued that strict scrutiny should apply because the state was treating different groups of people differently in a matter related to voting, but the Ninth Circuit explained that this argument "confuses two separate strands of equal protection doctrine: suspect classifications and fundamental rights."[39] Although the first strand "bars a state from codifying a preference for one class over another," it "prescribes heightened scrutiny only where the classification is drawn from a familiar list—race, gender, alienage, national origin."[40] And although the second strand "bars a state from burdening a fundamental right for some citizens but not for others," it prescribes no special scrutiny for legislative distinctions "[a]bsent some such burden."[41] Alaska state constitutional law similarly prescribes strict scrutiny only when the State employs a suspect classification or burdens

---

[38]     *Id*. at 676.

[39]     *Id*. at 678-79.

[40]     *Id*.

[41]     *Id*.; *see also Obama for Am. v. Husted*, 697 F.3d 423, 431-32 (6th Cir. 2012) ("[I]f the State merely classified voters disparately but placed no restrictions on their right to vote, the classification would survive if it had a rational basis").

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                              Page 16 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 16 of 29

a fundamental right.[42] Here—as in *Short*—because the State has neither employed a suspect classification nor burdened a fundamental right, strict scrutiny does not apply.

The State's mailing differentiates voters based on age, but age is not a suspect classification under state or federal law[43] and does not require strict scrutiny absent a burden on the right to vote. For this reason, the Fifth Circuit recently concluded in *Texas Democratic Party v. Abbott* that Texas was likely to succeed in its appeal of a district court ruling striking down a much more restrictive age-based voting law—that limited absentee voting to those 65 and older and required most voters to go to the polls in person.[44] The Fifth Circuit relied in part on *McDonald v. Board of Election Commissioners of Chicago*, in which the U.S. Supreme Court concluded that an Illinois statute denying certain inmates mail-in ballots did not restrict their right to vote because

---

[42]     *See Pub. Employees' Ret. Sys. v. Gallant*, 153 P.3d 346, 349–50 (Alaska 2007) ("We most often review a classification 'by asking whether a legitimate reason for disparate treatment exists, and, given a legitimate reason, whether the enactment creating the classification bears a fair and substantial relationship to that reason.' The 'legitimate reason' inquiry is the standard level of scrutiny that we apply in equal protection cases. But when a classification is based on a suspect factor (for example, race, national origin, or alienage) or infringes on fundamental rights (for example, voting, litigating, or the exercise of intimate personal choices) a classification will be upheld only when the enactment furthers a 'compelling state interest' and the enactment is 'necessary' to the achievement of that interest. We refer to this as the strict scrutiny standard.").

[43]     *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313-14 (1976) (per curiam) (holding that a mandatory retirement age of fifty for police officers was subject to rational basis review because it implicated neither a fundamental right nor a suspect class, explaining "even old age does not define a 'discrete and insular' group in need of 'extraordinary protection from the majoritarian process.' Instead, it marks a stage that each of us will reach if we live out our normal span"); *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 264 n.50 (Alaska 2004) ("Age is not a suspect class.").

[44]     961 F.3d 389, 403 (5th Cir. 2020).

*DLC, et al. v. Meyer, et al.*                          Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                Page 17 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 17 of 29

there was no evidence that the state would not provide them another way to vote.[45] The Fifth Circuit reasoned that "Texas's decision to allow those aged sixty-five and older to vote by mail does not 'impact' the plaintiffs' ability to vote," and because "there is no evidence that Texas has prevented the plaintiffs from voting by all other means," the "right to vote is not 'at stake,'" and, under *McDonald*, "rational basis review follows."[46] If being denied an absentee ballot entirely (as in *McDonald* and *Texas Democratic Party*) is not a burden on the right to vote that requires strict scrutiny, surely needing to take simple steps to obtain an absentee ballot (as in Alaska) is not a burden either.

DLC mistakenly argues that the Twenty-Sixth Amendment requires a different analysis for voting-related claims based on age, [Dkt. 13 at 16-22] but it does not: strict scrutiny does not apply absent a severe burden on the right to vote. The Fifth Circuit in *Texas Democratic Party v. Abbott* concluded that the "well-respected logic of *McDonald* applies equally to the Twenty-Sixth Amendment claim" based on age discrimination, explaining that "*McDonald's* logic applies neatly to the Twenty-Sixth Amendment's text—which was ratified two years after *McDonald*—because the Amendment similarly focuses on whether the state has 'denied or abridged' the right to vote."[47] Logically speaking, "[i]f a state's decision to give mail-in ballots only to some voters does not normally implicate an equal-protection right to vote," then "neither does it implicate

---

[45]    *Id*. at 403-05 (discussing *McDonald*, 394 U.S. 802 (1969)).

[46]    *Id*. at 404 & n.30.

[47]    *Id*. at 408.

*DLC, et al. v. Meyer, et al.*                                          Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                          Page 18 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 18 of 29

'[t]he right . . . to vote' of the Twenty-Sixth Amendment."[48] The Seventh Circuit has likewise concluded that claims based on the Twenty-Sixth Amendment do not merit different analysis than other voting rights claims.[49]

In their complaint, DLC also pleads claims based on race and geographical location, but the State has not classified voters on these bases (nor is location a suspect classification in any event), and DLC does not discuss those claims in their motion. DLC is correct that strict scrutiny would apply if the State were to mail absentee ballot applications to only voters of a certain race, because race is a suspect classification. [Dkt. 13 at 17] But the State has not done anything of the sort.

Thus, none of DLC's constitutional theories require anything more than that the State's actions satisfy rational basis review,[50] a test which is easily met here.

> ### 2. The State's mailing to a known class of high-risk voters readily satisfies rational basis review.

DLC incorrectly asserts that the State's mailing is "illogical" and "cannot even survive rational basis review." [Dkt. 13 at 21] Reaching out to encourage a high-risk group to vote absentee was a reasonable measure that comported with the public health information available at the time. Although DLC appears to believe that no reasonable

---

[48]    *Id.* at 409.

[49]    *Luft*, 963 F.3d at 673 (agreeing with district court's assessment that "arguments under the Twenty-Sixth Amendment (for age)" were "just different ways of presenting contentions under Anderson and Burdick" and did not need to be analyzed separately).

[50]    *See Texas Democratic Party*, 961 F.3d at 406 ("*McDonald* directs us to review only for a rational basis, under which 'statutory classifications will be set aside only if no grounds can be conceived to justify them.' The law need only 'bear some rational relationship to a legitimate state end.'") (quoting *McDonald*, 394 U.S. at 809).

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                     Page 19 of 29

Case 3:20-cv-00173-JMK    Document 22    Filed 08/03/20    Page 19 of 29

person could possibly conclude that anything other than mailing forms to all Alaska voters was rational, this is not true.

When the Lieutenant Governor decided to send out the mailing, public health officials had identified people aged 65 and older as a high-risk group that should be particularly careful to avoid exposure to COVID-19. [Applebee Decl. at ¶ 7; Zink Decl. at ¶ 3] And, critically, this was a group that the Division could readily and effectively target with an outreach effort because it can identify voters aged 65 and older based on information in its voter database. The same is not true for other high-risk groups, like those with medical conditions. [Applebee Decl. at ¶ 8]

Although DLC argues that it was irrational not to send paper application forms to every registered voter, the Division was justified in wanting to encourage as many voters as possible to request absentee ballots through its new online system rather than by paper application. Online applications are much easier and quicker for the Division to process, and the Division cannot control how many applications it will receive or when. Given the potential for the Division to be overwhelmed by paper applications and the introduction of a new, faster and more efficient online system, it was rational for the Lieutenant Governor to target the paper application outreach effort at elderly voters because they are both at higher risk than younger voters and may be less comfortable with online technology. [Applebee Decl. at ¶ 7]

DLC illustrates a lack of understanding of election administration and the challenges the Division faces by repeatedly asserting that the State's targeted outreach was utterly illogical and contrary to its interest in reducing the threat to public health and

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                         Page 20 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 20 of 29

ensuring a smoothly-run election. Increased absentee voting will help to minimize the public health threat while maximizing voters' opportunities to vote only *if* the Division can process applications in a timely fashion. Sending paper application forms to every registered voter could result in major processing delays as the Division tries to balance the demands of putting on an in-person election, as well as offering early and absentee-in-person voting. [Fenumiai Decl. at ¶ 16]

The State's targeted outreach effort was designed to increase absentee voting while also managing the flow and processing of absentee ballot applications. The more people who vote absentee the easier it will be for those who go to the polls to maintain social distance and limit their potential exposure to COVID-19. But the Division also wants to encourage as many voters as possible to use the online portal to apply so that it can effectively and efficiently process applications. DLC is correct that the State's mailing of applications to older voters will inevitably reach some voters who do not want a paper application, and will not reach some other voters who do want a paper application, but this does not create a constitutional problem. Voters who want a paper application can obtain one easily, with only the most minimal effort, even if they are under 65. The State made a reasoned, legitimate decision to help mitigate pandemic health challenges in this election by reaching out to a vulnerable group it could readily identify. As the Fifth Circuit recently commented: a state "may take one bite at the apple; it need not swallow it whole."[51]

---

[51]     *Texas Democratic Party v. Abbott*, 961 F.3d 389, 407 (5th Cir. 2020).

*DLC, et al. v. Meyer, et al.*                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                    Page 21 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 21 of 29

In essence, DLC's complaint is simply that the State has made a different policy choice than they would like. But this Court should not second-guess the Division's eminently rational assessment—based on years of successful election administration—that the most effective approach to conducting an election in the context of a pandemic was not to sideline its new, more efficient online absentee ballot application process in favor of a mass mailing that would encourage voters to submit paper applications instead. The State reasonably decided to target a high-risk group of voters who might be less comfortable with the online application—one that the State could actually identify based on voter records—and send paper applications to them.[52]

The State's choice easily satisfies rational-basis review. What is more, given the potential for serious delays in processing paper applications if the Division were to become overwhelmed, the decision would survive an even more rigorous level of scrutiny.

**B.     The Americans with Disabilities Act does not apply.**

DLC's ADA claim similarly misses the mark. Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." By its plain terms, it applies only to individuals with a disability who are denied a

---

[52]     *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) ("… a federal court cannot lightly interfere with or enjoin a state election.").

*DLC, et al. v. Meyer, et al.*                          Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                          Page 22 of 29
Case 3:20-cv-00173-JMK     Document 22     Filed 08/03/20     Page 22 of 29

benefit *by reason of the disability*. The State has not discriminated against disabled individuals nor denied any such individuals any benefits by reason of disability.

The State action challenged here—the mailing of absentee ballot applications to older voters—does not prevent disabled voters of any age from voting (i.e. participating in or enjoying the benefits of the services, programs, or activities of the Division of Elections), including by applying for and voting absentee ballots. To the contrary, disabled voters remain fully able to obtain an absentee ballot or to vote by one of the many other methods described above, which include various special accommodations for disabled voters.[53] Disabled voters face no additional impediment to exercising their right to vote—whether in person or by absentee ballot—as a result of the State's mailing to voters aged 65 and older.

Even if the court defines the "program" at issue here as the State's mailing of absentee ballot applications, no "qualified individual with a disability" was excluded from that program "*by reason of such disability*." Some disabled voters—those aged 65 and over—will receive the mailing. And disabled voters who do not receive the mailing were excluded by reason of their age—not their disability. Thus, there is no violation of the ADA; and DLC cannot show a probability of success on the merits of that claim.

C.    **Alaska's absentee-by-mail ballot application deadline does not violate the Voting Rights Act.**

In their amended complaint, DLC has added a new count, alleging an unrelated

---

[53]    *See supra* at 5-6.

*DLC, et al. v. Meyer, et al.*
Opp. to Mot. for Prelim. Inj.

Case No. 3:20-cv-00173-JMK
Page 23 of 29

claim that Alaska's statutory deadline to submit an absentee-by-mail application violates the federal Voting Rights Act.[54] [Dkt. 8-1 at 27-28] This claim lacks merit because it is based on a careless misreading of both the Alaska statute and the Voting Rights Act.

DLC's claim is based on 52 U.S.C. § 10502(d) which requires states to "provide by law for the casting of absentee ballots" in presidential elections, "by all duly qualified residents of such State who may be absent from their election district" on election day "and who have applied therefor not later than seven days immediately prior to such election and have returned such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election." DLC asserts that Alaska improperly provides a ten-day deadline rather than a seven-day deadline for absentee-by-mail ballot applications. But significantly, the federal statute refers only to the "casting of absentee ballots" not the casting of absentee ballots *by mail*.

Alaska provides alternative ways to apply for absentee ballots within the federal statute's seven-day timeframe. By-mail delivery of an absentee ballot is not the only option provided by Alaska law for voters who will be "absent from their election district"[55] on election day. Alaska Statute 15.20.081(b) allows a voter to request an absentee ballot that will be delivered "by electronic transmission," and an application for such an absentee ballot may be submitted up until "5:00 p.m. Alaska time on the day

---

[54]    AS 15.20.081(b) provides in part: "An application requesting delivery of an absentee ballot by mail must be received by the division of elections not less than 10 days before the election for which the absentee ballot is sought…"

[55]    52 U.S.C. § 10502(d).

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                    Page 24 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 24 of 29

before the election for which the absentee ballot is sought." This option brings Alaska

into compliance with 52 U.S.C. § 10502(d),

Requiring a seven-day turnaround for absentee by-mail ballot applications in

Alaska would be impractical given that 52 U.S.C. § 10502(d) also requires absentee

ballots to be *returned* before the polls close on election day in order to be counted. The

realities of rural postal service in Alaska make a seven-day deadline unworkable for

absentee by-mail voting.[56]

But by-mail delivery of an absentee ballot is not the only option provided by

Alaska law for voters who will be "absent from their election district"[57] on election day.

Alaska Statute 15.20.081(b) also allows a voter to request an absentee ballot that will be

delivered "by electronic transmission," and an application for such an absentee ballot

may be submitted up until "5:00 p.m. Alaska time on the day before the election for

which the absentee ballot is sought." This option brings Alaska into compliance with

52 U.S.C. § 10502(d).

Thus, DLC also cannot show a probability of success on the merits of their Voting

Rights Act claim.

---

[56]     Instead, AS 15.20.081(b) requires that "[a]n application requesting delivery of an absentee ballot to the applicant by mail must be received by the division of elections not less than 10 days before the election for which the absentee ballot is sought," and AS 15.20.081(e) requires the voter to mail the ballot back to the division "not later than the day of the election" and provides that "the ballot may not be counted unless it is received by the close of business on the 10th day after the election." Thus, for by-mail absentee ballots, Alaska law requires earlier submission of the application than contemplated by 52 U.S.C. § 10502(d), while also allowing later receipt of the voted ballot.

[57]     52 U.S.C. § 10502(d).

*DLC, et al. v. Meyer, et al.*                                      Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                      Page 25 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 25 of 29

**D.** **DLC has not established irreparable harm absent an injunction, and the balance of the equities and the public interest do not favor imposing additional administrative burdens on the State immediately before an election.**

DLC's claim of irreparable harm rests on the false premise that unless the Division mails a paper absentee ballot application form to all Alaska voters, they are denied equal access to the ballot box. Ninth Circuit precedent demonstrates that this notion is untenable. That Court held that even a system in which actual absentee ballots—not just applications—were automatically sent to some voters but not others "does not burden anyone's right to vote. Instead, it makes it easier for some voters to cast their ballots by mail, something that California voters already can do."[58] Because all Alaska voters can already apply for an absentee ballot—and indeed have multiple avenues for doing so— the individual plaintiffs' right to vote is not burdened at all. Indeed, DLC claims only that the "two individual plaintiffs will be faced with an obvious individual hardship: they must obtain absentee ballots without the benefit of the assistance the State has prov[id]ed to older voters." [Dkt. 13 at 37] But given the many ways these plaintiffs—who do not allege that they lack computers, or internet access, or telephones, or the ability to visit a Division office, local library, tribal or municipal office—could apply for an absentee ballot, this is not a cognizable hardship, much less an irreparable harm. And the organizational plaintiffs have not alleged that they previously have engaged in voter outreach or attempted to encourage absentee voting among their members or constituents,

---

[58]  *Short*, 893 F.3d at 677.

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                   Page 26 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 26 of 29

much less that their voting-related efforts will somehow be derailed, because a subset of voters got a form in the mail.[59]

Just as the plaintiffs overstate their alleged harm, they also fail to even acknowledge—let alone properly appreciate—the potential impact of diverting potentially tens of thousands of Alaska voters from using the efficient online absentee ballot application in favor of paper forms that take significantly more effort to process. The State's potential harm lies not in the front-end cost of mailing paper applications to all voters, but in the back-end result of such a mailing: i.e., the possibility that the Division will receive a flood of paper applications close to the deadline that it may struggle to process in a timely manner.

Absentee ballots must be postmarked on or before election day,[60] but voters cannot cast ballots that they have not yet received, and the Division cannot send out ballots to voters whose applications it has not yet processed. The Division has hired additional staff to process the anticipated increase in absentee ballot applications this year, but it cannot rapidly expand its processing capacity while maintaining the integrity of the election. [Fenumiai Decl. at ¶ 17] Recruiting and training qualified staff takes weeks—not days—and the pandemic means that increasing the number of staff also requires finding more temporary space so that workers can maintain proper social

---

[59]    *Cf. Haven Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that organization had standing to challenge practices that caused drain on organization's resources).

[60]    AS 15.20.081(e).

Case 3:20-cv-00173-JMK    Document 22    Filed 08/03/20    Page 27 of 29

distance while also being able to access the Division's secure voter database. [Fenumiai Decl. at ¶ 17]

The Division is doing everything it can to avoid the processing failures that overwhelmed the Wisconsin primary election in April, forcing many voters who had applied for absentee ballots, but not received them, to choose between going to potentially crowded polling places or being disenfranchised.[61] DLC's second-guessing of the Division's decisions about how best to run the election in this unprecedented context is a needless and harmful distraction. This is exactly why the U.S. Supreme Court has held that courts should not change the manner of conducting elections on the eve of an election—doing so requires them to get into the weeds of decisions that could ultimately have a negative effect on an election, instead of a positive one.[62] Thus, the balance of hardships tips not in DLC's favor, but rather sharply in favor of the State.

Similarly, the public interest would not be served by an injunction requiring the State to divert resources to a mass mailing that could create a bureaucratic debacle in the general election. This Court should decline the plaintiffs' invitation to micromanage the

---

[61] *See* "Inside Wisconsin's Election Mess: Thousands of Missing or Nullified Ballots," N.Y. TIMES, Apr. 9, 2020, https://www.nytimes.com/2020/04/09/us/politics/wisconsin-election-absentee-coronavirus.html?searchResultPosition=5. Other states have experienced similar and/or related problems. *See e.g.*, "Beyond Georgia: A Warning for November as States Scramble to Expand Vote-by-Mail," N.Y. TIMES, June 10, 2020, https://www.nytimes.com/2020/06/10/us/politics/voting-by-mail-georgia.html.

[62] *Purcell v. Gonzales*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, and themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

*DLC, et al. v. Meyer, et al.*                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                    Page 28 of 29

Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 28 of 29

State's election administration.

## V.     CONCLUSION

Because DLC has not established its entitlement to a preliminary injunction, this

Court should deny its motion.

DATED August 3rd, 2020.

KEVIN G. CLARKSON
ATTORNEY GENERAL


By:      */s/ Margaret Paton-Walsh*
Margaret Paton-Walsh
(AK Bar No. 0411074)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
Email: margaret.paton-walsh@alaska.gov


## CERTIFICATE OF SERVICE

I certify that on August 3rd, 2020, the foregoing document was served on all

parties via the CM/ECF filing system.

*/s/ Margaret Paton-Walsh*
Margaret Paton-Walsh
Assistant Attorney General

*DLC, et al. v. Meyer, et al.*                                    Case No. 3:20-cv-00173-JMK
Opp. to Mot. for Prelim. Inj.                                              Page 29 of 29
Case 3:20-cv-00173-JMK   Document 22   Filed 08/03/20   Page 29 of 29